[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Introduction
This is an action commenced by the Plaintiff wife on November 30, 1999, seeking a dissolution of marriage on the grounds of irretrievable breakdown. She also claims a fair division of property and debts as well as alimony. The complaint was served on the Defendant on November 18, 1999. On December 2, 1999, the Defendant husband appeared pro se. Counsel appeared in his stead on January 6, 2000. On September 19, 2000 the Defendant filed an Answer and Cross Complaint in which he seeks a dissolution of marriage on the grounds of irretrievable breakdown. He also claims "[a]n equitable property settlement which would include, but not be limited to the adoption of the Marital Dissolution Agreement dated November 30, 1999 and signed by each party on that date" and "an allowance to defend." On October 6, 2000 the Plaintiff was allowed to amend her prayer for relief to also claim alimony, pendente lite, transfer of Defendant's interest in real estate and an equitable division of property. On December 7, 2000 the court issued orders, pendente lite, which provided that: 1) the Defendant maintain Plaintiffs medical insurance coverage; 2) the Defendant make all mortgage, taxes and insurance payments on the Nantucket property and obtain/maintain insurance on the property; 3) no attorneys fees be assessed on either side; 4) the Defendant pay the Plaintiff alimony in the amount of $500 per week, to be paid bi-weekly, $1,000 at a time starting December 7, 2000; 5) alimony to be paid retroactive to July 5, 2000, approximately 22 weeks, for a total of $11,000, payment to be made by December 31, 2000.
On June 10, 2002 the Defendant moved for summary enforcement of the Marital Dissolution Agreement (the agreement is set forth in full in the appendix to this decision). On June 11, 2002 the Plaintiff was allowed to amend her complaint to include a claim for attorneys' fees. Trial was begun on June 11, 2002. At that time it was agreed that the court would also consider various pending motions. They are: 1) the Defendant's Motion to Modify Alimony, Pendente Lite, dated August 2, 2001; 2) CT Page 15 Plaintiffs Motion to Modify Alimony, Pendente Lite, dated November 8, 2001; and 3) Plaintiffs Motion for Contempt, dated April 15, 2002.
The court, at the start of trial, denied the Defendant's Motion in Limine to preclude the introduction by the Plaintiff of any evidence outside the purview of the court's inquiry pursuant to General Statutes § 46b-66 as to whether the Marital Dissolution Agreement was fair and equitable. The court stated that it would allow the Defendant to argue that the Marital Dissolution Agreement should be subject to summary enforcement and the court would decide that issue as part of its final decision. Trial continued on June 12, 13, 17, July 9, 10, 12, 30, and 31.
Both parties testified extensively and the court heard testimony from twenty other witnesses. The court also received 73 exhibits (some of which are duplicates). At the close of evidence, the court ordered that simultaneous briefs be filed addressing the following issues: 1) Defendant's Motion to Modify Alimony, Pendente Lite, dated August 2, 2001; 2) Plaintiffs Motion to Modify Alimony, Pendente Lite, dated November 8, 2001; 3) Plaintiffs Motion for Contempt, dated April 15, 2002; 4) Is the agreement of the Parties (Exhibit 1) subject to summary enforcement by the court?; 5) If the court finds that the agreement should be enforced by the court, what should be the scope of the court's review pursuant to General Statutes § 46b-66 in determining whether it is fair and reasonable?; and 6) If the court finds that the agreement should not be enforced, what are appropriate orders pursuant to General Statutes §§ 46b-81 and 46b-82?. Memoranda and proposed revised orders were filed by both parties on September 13, 2002.
Findings of Fact and Discussion
The court's factual findings have been made from the testimony and evidence presented, and after carefully assessing the credibility of the witnesses. They will be discussed in the context of each of the issues that must be decided by the court. However, some initial findings are important to establish the context of these orders.
The parties were married on November 22, 1987 in Woodstock, Connecticut. The Plaintiff wife's birth name was Sarantopouplos. There are no minor children issue of the marriage and no minor children have been born to the wife since the date of the marriage. The parties have one adult child, who was born to the Plaintiff prior to the marriage and adopted by the Defendant. Neither the state of Connecticut nor any town thereof has contributed to the support and maintenance of either party. The Plaintiff has resided continuously in this state for more than twelve CT Page 16 months immediately prior to the date of the complaint. The court finds that it has jurisdiction over the parties and the marriage. The court also finds that the marriage has broken down irretrievably and there is no hope for reconciliation.
The parties are both practicing attorneys. The Plaintiff wife is forty-four years old and the Defendant husband is forty. They met while in law school and married while still in school. In law school the Plaintiff was a member of the Law Review and Phi Beta Kappa. In 1988 the parties graduated from law school, passed the bar, and joined the already established practice of the Plaintiffs father in Killingly, Connecticut. The Plaintiffs father left the firm in 1993 and the parties continued to practice together until the Plaintiff left the firm in November 1999. The Defendant handled criminal and personal injury matters while the Plaintiff limited her practice to domestic cases. They were such a successful partnership that they amassed significant assets, including a house in Nantucket, a house valued at $545,000 in Woodstock, Connecticut, as well as horses and airplanes.
Defendant's Motion to Modify Alimony. Pendente Lite. dated August 2, 2001
In this motion the Defendant claims that the alimony ordered by the court to be paid pendente lite to the Plaintiff should be terminated retroactive to August 2, 2001, the date of the filing of the motion, because the Plaintiff resumed her law practice at that time and the court's original order was based on the fact that she was not working. On December 7, 2000 the court ordered the Defendant to pay the Plaintiff $500 per week in alimony. In her financial affidavit submitted at that time the Plaintiff claimed no income. In January 2001, when seeking a loan for a car, she claimed income of $60,000. In her financial affidavits dated April 15 and June 11, 2002, she claimed net income of $280 per week from employment even though she opened an office for the practice of law in Putnam on August 1, 2001.
General Statutes § 46b-86 (a) provides in relevant part: "Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support or an order for alimony or support pendente lite may at any time thereafter be continued, set aside, altered or modified by said court upon a showing of a substantial change in the circumstances of either. . . .". In determining whether there has been such a substantial change in financial circumstances such as to warrant a modification of alimony the court must look at the present overall circumstances of the parties as well as their income. Gay v. Gay, 70 Conn. App. 772, 781 (2002). The party seeking modification bears the burden of showing the existence of a substantial CT Page 17 change in circumstances. Sheam v. Shearn, 50 Conn. App. 225, 228 (1998).
The Plaintiff claims that the motion should be denied because of the financial position of the parties and also because the Defendant does not have "clean hands." The Plaintiff bases this latter claim on the suggestion that since the Defendant filed the motion at the time the Plaintiff opened her law office, the "Defendant forgot what it costs to open and run a law office or he wanted to intimidate the Plaintiff." The Plaintiff also cites numerous other actions by the Defendant between October 29, 1999 and January 5, 2000 which the Plaintiff claims were vindictive and harmful to her.
The Plaintiff voluntarily left the practice of law in November 1999. The Defendant then advised the Plaintiffs clients that she had retired from the practice of law. Prior to that time she had indicated she was retiring and moving to Nantucket. She subsequently changed her mind and decided to open a law practice in Putnam. She spent a substantial amount of time and money renovating office and living space for this purpose. She did not resume practicing until August 2001. Despite her obvious capabilities as an attorney she did not seek employment as a lawyer with another firm or resume practicing on her own for almost two years. It is also unclear why her income has remained at such a low level despite the fact that she has been practicing in her new office for ten months and she has the admitted ability to earn at least $60,000 per year. In addition, she shares office space with her male companion. He is her associate and does her paperwork, yet he receives no salary and pays no rent.
In any event, the burden is on the Defendant on this motion and considering the small increase in actual income by the Plaintiff since the time of the pendente lite orders, the Defendant has not established a substantial change in circumstances.
Therefore the Defendant's Motion to Modify Alimony, Pendente Lite, dated August 2, 2001 is denied.
Plaintiff's Motion to Modify Alimony, Pendente Lite, dated November 8, 2001
The Plaintiff claims in her Motion to Modify Alimony, Pendente Lite, dated November 8, 2001, an upward modification of the alimony order because her expenses have substantially increased and she has had to sell some of her assets and incur more debt to meet her needs. As noted above, General Statutes § 46b-86 (a) does allow for modification of an order for alimony pendente lite upon a showing of a substantial change in the circumstances of either party. In her financial affidavit of CT Page 18 December 7, 2000 she claimed no income; $1,064,567 in assets; $117,385 in liabilities; and weekly expenses of $2,246. As of June 10, 2002, she claimed net income of $280 per week; $738,317 in assets; $133,928 in liabilities; and weekly expenses of $1,245. The Plaintiff claims that the Defendant's income has increased significantly since December 7, 2000. At that time his financial affidavit listed net income of $767 per week; assets of $797,749; liabilities of $38,339; and weekly expenses of $2,067. Yet the Plaintiff admits that at the hearing on December 7, 2000, the Defendant's gross income was shown to be $230,000. The Defendant's net income on his June 10, 2002 affidavit is $2,001 per week; assets are $972,225; liabilities are $23,666; and weekly expenses, excluding the alimony payment, are $2,185. He based his income on his 2001 tax return in which his adjusted gross income, excluding any alimony payments, is approximately $129,000.
The Plaintiff claims that on the basis of the financial affidavits alone there is established a substantial change in circumstances. However, a review of the Plaintiffs financial affidavit indicates that her income has increased while her expenses have decreased. Although her assets have decreased she still has significant assets which are greater than her liabilities. In addition, the Defendant's financial affidavit in December 2000 reflected income at a level less than was established at the pendente lite hearing. What the Plaintiff claims was established as his income then is less than what was stated on his affidavit of June 10th. Considering these facts as well as those noted above in the discussion of the Defendant's Motion to Modify, the Plaintiff has failed to establish a substantial change in circumstances and her Motion to Modify Alimony, Pendente Lite, dated November 8, 2001, is denied.
Plaintiff's Motion for Contempt, dated April 15, 2002
In the Plaintiffs Motion for Contempt dated April 15, 2002, she seeks an order holding the Defendant in contempt because the Defendant has not paid the alimony as ordered by the court on December 7, 2000. The Plaintiff contends that this involves two issues: "(1) as of the completion of testimony, the Defendant was $2,500 in arrears from June 7, 2002, on said order and (2) that since the entry of said order, the defendant had been paying alimony from the monies the Defendant acknowledged was the Plaintiffs partnership interest in Weiss and Weiss, which the Defendant stated he would hold in escrow."
""Pendente lite orders, by their very definition, are orders that continue to be in force during the pendency of a suit, action or litigation.' Febbroriello v. Febbroriello, 21 Conn. App. 200, 206,572 A.2d 1032 (1990). "The fundamental purpose of alimony pendente lite CT Page 19 is to provide the wife, during the pendency of the divorce action, with current support in accordance with her needs and the husband's ability to meet them.' Smith v. Smith, 151 Conn. 292, 297, 197 A.2d 65 (1964). "[Luke unpaid installments of an alimony award entered at the time of dissolution, accrued and unpaid installments of alimony pendente lite are, in effect, debts which have become vested rights of property which the court cannot take away.' Elhott v. Elhott, 14 Conn. App. 541, 545,541 A.2d 905 (1988); see Smith v. Smith, supra, 297." Papa v. Papa,55 Conn. App. 47, 53 (1999).
As to the first issue, on September 18, 2002, subsequent to the filing of the briefs here, the Plaintiff filed another Motion for Contempt in which she claimed that since June 7, 2002, the Defendant has failed to pay alimony and is now fourteen weeks behind for an arrearage of $7,000. By agreement of the parties, which was adopted as an order of the court on September 30, 2002, the Defendant paid the Plaintiff $7,000 and agreed to become current with his alimony payments and continue to pay the current alimony order until further order of the court. The Defendant also agreed to pay the Plaintiffs attorney $250 for having to file the motion. This order therefore resolves the issue of any arrearage owed by the Defendant from June 7, 2002 to the conclusion of testimony.
As to the second issue, the Plaintiff claims that the Defendant paid the alimony order from moneys which belonged to the Plaintiff and, therefore, in essence, he made no payments. It is undisputed that the Defendant did use some of the funds he was holding in so-called "escrow" to make the alimony payments. These funds were those the Defendant was voluntarily setting aside pursuant to the provisions of Paragraph 9 of the Marital Dissolution Agreement which provided that the Plaintiffwould receive a certain percentage of the fees generated by cases pending in the parties' law offices as of November 1, 1999. Although the Defendant had represented in a deposition in October 2000 that he did not intend to invade that account for any purpose, there was no court order that he not do so. Nor was there any order that he in fact segregate any funds from moneys coming into his firm in anticipation of an order that he pay certain funds to the Plaintiff as a result of the final judgment in this matter. The Plaintiff had moved that the court order the Defendant to pay over certain funds that the Defendant allegedly possessed as a result of the dissolution of their partnership but this request was denied by the court on December 7, 2000. (Motion #127). In any event, the Plaintiff through her actions in this matter, attempts to disavow the validity of the Marital Dissolution Agreement while at the same time claiming in her Motion for Contempt the benefit of its provisions. She cannot have it both ways. CT Page 20
"`The contempt remedy is particularly harsh . . . and may be founded solely upon some clear and express direction of the court. . . . One cannot be placed in contempt for failure to read the court's mind.' (Citations omitted; internal quotation marks omitted.) Blaydes v. Blaydes,187 Conn. 464, 467, 446 A.2d 825 (1982)." Eldridge v. Eldridge,244 Conn. 523, 529 (1998). Since there was no order that the Defendant escrow any funds and that they not be used for any purpose, the Defendant cannot be held in contempt for making any alimony payments from those funds. Until the court determined otherwise the funds were lawfully his to be used as he pleased as long as such use did not violate the automatic orders. The Plaintiff also argues that the payment of the alimony from these funds was a violation of the automatic orders. Obviously the use of funds to pay a court order does not constitute a violation of the automatic court orders.
The Motion for Contempt is denied.
Is the agreement of the Parties (Exhibit 1) subject to summaryenforcement by the court?
After several years of strife and infidelity on the part of both parties, the beginning of the end of this marriage occurred on October 29, 1999 when the parties fought in their home. The Plaintiff stated then that this argument was the final straw and the marriage was over. The Defendant left the marital home and moved in with mutual friends. In the early morning hours of the next day, the parties were involved in another incident in Massachusetts when the Defendant attempted to arouse the Plaintiffs attention by driving alongside the car in which she was a passenger. Both cars were then stopped by the police. The Plaintiff was taken into protective custody because of her state of intoxication and subsequently arrested for resisting arrest and assaulting a police officer.
On or about October 31, 1999, the parties agreed they should divorce. The Plaintiff volunteered to draft the papers. The parties began discussing the division of their assets at that time. The Plaintiff was the most likely person to draft the dissolution papers, if the parties were to represent themselves, because her law practice was limited to divorce work. She is known as, and considers herself, one of the top matrimonial lawyers in Windham county. She has drafted hundreds of matrimonial agreements. She dictated the original draft of the language of the agreement to her assistant. The agreement was changed and revised by the Plaintiff between seven and ten times.
On November 4, 1999 the Plaintiff met with a lawyer to represent her in CT Page 21 the Massachusetts' matter. Shortly thereafter the Plaintiff stopped practicing law and going to the office. Since about August 1999, she had been essentially working part-time, coming into the office at ten in the morning and leaving at two in the afternoon.
On November 14, 1999 there was an altercation between the parties' son and the Plaintiffs male companion, her attorney, in the parties' Woodstock home. The companion was injured and the Plaintiff moved in with him to care for him. The son was subsequently arrested as a result of this incident. On November 15, 1999 the Defendant threatened in a letter to move back into the marital home if the Plaintiff had overnight guests there.
On November 18, 1999, the Defendant sent a letter to the Plaintiffs clients stating that the Plaintiff was retiring from the full time practice of law as of January 1, 2000 and that she would remain of counsel to the firm for the next year. On November 27, 1999, the Plaintiff claimed a disqualification from jury service in Connecticut stating, under the penalty of false statement, that she was not a resident of Connecticut and that her address was 26 Arlington Street, Nantucket, Massachusetts, the parties' home in Nantucket.
On November 30, 1999 both parties signed the marital dissolution agreement which had been primarily drafted by the Plaintiff. That agreement is set forth in full in the appendix to this Opinion. The witnesses to the signing of the agreement stated that the Plaintiff never indicated she was under duress and that she was happy and relieved at the signing. That same day the divorce complaint was filed in court. The complaint had already been drafted by the Plaintiff and served on the Defendant on November 18, 1999. Later the Plaintiff would tell a friend that she thought the agreement was a great agreement, and that she was extremely happy about it. She felt that it was more favorable to her than to the Defendant. The Plaintiff never indicated to her friend that she was under duress when she signed the agreement.
On or about December 2nd or 3rd 1999, the Plaintiff, and her male companion, who was also her attorney in the Massachusetts' matter, went on a vacation to Jamaica for about two weeks. Approximately a week after her return from Jamaica, on December 23, 1999, the Plaintiff and the agreement. At that time the real estate deeds reflecting the transfers of property required by Paragraph 4 of the agreement were also signed. The deed conveying the Plaintiffs interest in the Woodstock property to the Defendant listed her residence as Nantucket. Under penalty of false statement the Plaintiff, on that same date, listed her address as 26 Arlington Street, Nantucket, on a real estate conveyance tax return. The CT Page 22 witnesses to these transactions describe the Plaintiff as very relaxed, casual, even happy, and she never indicated she was unhappy with the agreement or under duress. Later the Defendant paid the Plaintiff $115,000 of the first installment of $125,000 due under Paragraph 5 of the agreement.
The Plaintiff argues that the agreement of the parties is not subject to summary enforcement because she did not enter into it voluntarily and "the circumstances of the parties now are beyond the contemplation of the parties at the time the agreement was entered into as to cause its enforcement to work an injustice." The Defendant claims that the agreement should be subject to summary enforcement but only if the court determines it can award him attorney's fees.
General Statutes § 46b-66 provides: "In any case under this chapter where the parties have submitted to the court an agreement . . . concerning alimony or the disposition of property, the court shall inquire into the financial resources and actual needs of the spouses . . ., in order to determine whether the agreement of the spouses is fair and equitable under all the circumstances. If the court finds the agreement fair and equitable, it shall become part of the court file, and if the agreement is in writing, it shall be incorporated by reference into the order or decree of the court. If the court finds the agreement is not fair and equitable, it shall make such orders as to finances . . . as the circumstances require. . .".
"An agreement may be binding between the parties even before the court has examined it pursuant to 46b-66. 24 Am.Jur.2d, Divorce and Separation 899. To hold otherwise is to take away the certainty necessary if parties to a marriage dissolution are to enter into a bargaining process and attempt to work out their own solutions. In the final analysis, the court must still determine that the agreement is fair and equitable." North v. North, 183 Conn. 35, 38 (1981).
The Plaintiff claims that antenuptial agreements are enforceable if the conditions set forth in McHugh v. McHugh, 181 Conn. 482 (1980) are met. Although McHugh involved an agreement entered into by the parties prior to the marriage, the criteria it established regarding enforcement of antenuptial agreements have been used in evaluating the validity of separation agreements entered into in anticipation of a divorce. See, Wilmot v. Wilmot, Superior Court, judicial district of Stamford/Norwalk, Docket No. FA 950147844 (November 27, 1998). In McHugh the court stated:
"Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the CT Page 23 dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice. See Clark, Law of Domestic Relations (1968) 1.9; 2 Lindey, Separation Agreements and Ante Nuptial Contracts (Rev. Ed. 1970) 90; 1 Nelson, Divorce Annulment (1945) 13.03; 41 C.J.S., Husband-Wife 80; 41 Am.Jur.2d, Husband Wife 283-305; annot., 57 A.L.R.2d 942. An antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law. In re Estate of Rosenstein,326 So.2d 239 (Fla.App. 1976); In re Estate of Luedtke, 65 Wis.2d 387,222 N.W.2d 643 (1974); 2 Lindey, op. cit. 90, p. 90-68; Clark, op. cit. 19, p. 27; see 41 Am.Jur.2d, Husband Wife 283, 288. To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire whether any waiver of statutory or common-law rights, or the right to a judicial determination in any matter, was voluntary and knowing. See, generally, 2 Lindey, op. cit. 90, p. 90-77. A party must, of course, be aware of any right that he possesses prior to a proper waiver of it. Ibid.; see In re Estate of Taylor, 205 Kan. 347,355, 469 P.2d 437 (1970); see also Stern Co. v. International Harvester Co., 148 Conn. 527, 534, 172 A.2d 614 (1961)." McHugh v. McHugh, supra, 181 Conn. 485-486.
The Plaintiff claims that conditions one and three cited in McHugh are not satisfied in this case. She argues that she did not voluntarily enter into the agreement because no disclosure of the parties' income or assets was made and there were no appraisals of the parties' personal or real property or an appraisal of their law practice and the value of the open files. The Plaintiff posits that although the exchange of financial affidavits is not necessary, each party must have independent knowledge of the nature and value of the parties' assets. She alleges that she did not have such knowledge.
The facts established at trial do not support the Plaintiffs claims. In fact, the Plaintiff herself compiled a list of the parties' accounts including account numbers and balances which she had available to her when she drafted the agreement. As late as October or November 1999 the Plaintiff also filed an amended federal tax return with the Defendant for the year 1998 because of a change in the Schedule K1 for the partnership of Weiss and Weiss. Therefore she was aware of the parties' assets as well as the firm's income.
The Plaintiff is an intelligent, resourceful person. She knew full well CT Page 24 what information she could request from the Defendant, if she so chose, before executing any agreement. This is demonstrated by her subsequent demands in her letter to the Defendant dated January 2, 2000 for "a professional accounting of income received or receivable during the fourth quarter of the tax year 1999 and all received and projected income during the year 2000 (including, but not limited to, all matters settled in which monies have not been received or have been delayed for income tax purposes," and "[a] comprehensive list of all clients engaged in our professional office from January 1, 1996 to the present together with the type of case and present status of matter including accounts receivable and demand letters issued" and "[t]he names and addresses of three proposed accountants, three proposed actuaries, and proposed real estate appraisers to assist us in determining the monetary value of our professional partnership and our real estate and other assets acquired during our marriage." Obviously, the Plaintiff could have made the same demands of the Defendant before the execution of the agreement if she felt it was necessary in order for her to be fully informed. She chose not to.
The Plaintiff also claims that she did not enter into the agreement voluntarily because she was under duress when she signed the agreement. She claims this duress stemmed from the threat of the husband to move back into the marital home and the emotional turmoil caused by her and her son's arrest. "For a party to demonstrate duress, it "must prove [1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim.' Barbara Weisman, Trustee v. Kaspar, 233 Conn. 531, 549-50 n. 15, 661 A.2d 530 (1995). "The wrongful conduct at issue could take virtually any form, but must induce a fearful state of mind in the other party, which makes it impossible for [the party] to exercise his own free will.' (Internal quotation marks omitted.) Zebedeo v. Martin E. Segal Co., 582 F. Sup. 1394, 1417
(D.Conn. 1984)." Noble v. White, 66 Conn. App. 54, 59 (2001).
Contrary to the Plaintiffs claims, there is no evidence that the Plaintiff was ever coerced or threatened into signing the agreement. She had already moved out of the Woodstock home prior to the Defendant's letter of November 15, 1999, threatening to move back in. Her friends and witnesses to the signing of the agreement did not believe, from their interactions with the Plaintiff during that time, that she signed the agreement under duress. In fact she advised one of her friends on several occasions that she was extremely happy about the agreement and that she thought it was a great agreement. It should also be noted that between when the agreement was signed on November 30, 1999 and when the deeds were executed and the joint accounts divided on December 23, 1999, the CT Page 25 Plaintiff took a two week vacation in Jamaica. This sojourn gave the Plaintiff ample opportunity to reflect upon the wisdom of her decision to sign the agreement away from the Defendant in the company of her companion and attorney. Upon her return she did not seek to disavow the agreement but rather continued to operate under its terms. Even at the time of her request to the court for an order requiring return of her law files, she stated in her affidavit dated January 6, 2000, that she was "undecided at this time whether or not [she] will seek enforcement of the Marital Dissolution Agreement or will argue against enforcement." Her reluctance now to support the agreement does not stem from a claim she did not know what she was doing at the time of its execution or was forced into signing it but simply from a change of mind. Therefore the court finds that the Plaintiff entered into the agreement knowingly and voluntarily.
The Plaintiff also claims that the Defendant breached the agreement during negotiations by preventing her from practicing law even prior to the signing of the agreement. Without an ability to earn a living the Plaintiff claims she would not have waived alimony. However the evidence is clear that the Plaintiff contemplated leaving the state and cease practicing law at the time the agreement was entered into. She had stopped practicing law earlier that month. She advised her associates and her assistant of her plans to retire and relocate. The letter the Defendant sent the firm's domestic clients on November 18th was no more than a reflection of the parties' understanding as stated in the agreement. The change in circumstances between those contemplated by the parties at the time of the entering into the agreement and now is solely the result of the Plaintiffs decision to open her own law office in Putnam, Connecticut almost two years later rather than retire from the practice of law and move to Nantucket as she planned at the time she signed the agreement. The fact that the Plaintiff changed her mind does not invalidate the agreement.
As the court stated in Sandberg v. Sandberg, 2000 Ct. Sup. 13046, 13047-13048 (Oct. 19, 2000). "When parties to a dissolution action reach a settlement agreement, that agreement cannot become a judgment of the court until the court has determined that it is fair and equitable and has been knowingly agreed upon. Costello v. Costello, 186 Conn. 773, 776
(1982); Connecticut General Statutes, Section 46b-66. In part, this conclusion arises from the statutory requirement that a court determine whether the agreement is fair and equitable under all the circumstances before entering judgment. Connecticut General Statutes, Section 46b-66. Summary enforcement of a divorce settlement involving complex issues of property distribution and the exchange of support creates a different process than the settlement of a dispute concerning damages for breach of CT Page 26 a lease; Audobon Parking Associates Ltd Partnership v. Barclay and Stubbs, Inc., 225 Conn. 804 (1983); or an action on a promissory note. DAP Financial Management Co. v. Mor-Fam Electric, Inc., 59 Conn. App. 92
(2000) . . . In addition, no settlement agreement can be summarily enforced unless the terms of the agreement are clear and unambiguous and the parties do not dispute the terms of the agreement. Thomsen v. Aqua Massage International, Inc., 51 Conn. App. 201, 204 (1998). The question, however, is not whether they dispute those terms at the time of a hearing on a motion for summary enforcement, but whether those terms were in dispute at the time the parties entered into the agreement. DAP Financial Management Co. v. Mor-Fam Electric, Inc., 59 Conn. App. 92, 97-98
(2000). With these principles in mind, admissible evidence necessary for a determination of whether any alleged agreement between these parties can be summarily enforced is limited to evidence which would establish that there was a clear and unambiguous agreement the terms of which were not in dispute at the time any such agreement was made. If the court hearing such evidence is satisfied that an agreement was reached, that court would then conduct its own inquiry pursuant to Section 46b-66 of the General Statutes."
The Plaintiff claims that certain provisions of the agreement are ambiguous. First, the term "of counsel" is not defined in Paragraph 9; second, the provisions of Paragraph 9 regarding the splitting of fees does not define whether the Plaintiff is to receiver her share from the net or the gross fees; third, the schedule of personal property was not attached to the agreement; and fourth, Paragraph 16 is vague. The Plaintiff concedes that the remaining terms of the agreement are not ambiguous. In analyzing these claims the court notes that the Plaintiff is an experienced and well respected family lawyer. She was primarily responsible for drafting the terms of the agreement. She made numerous changes in the language of the agreement over the course of the several weeks during which the agreement was being negotiated. The court finds it hard to believe that she felt that the terms that she drafted were ambiguous at the time she signed the agreement. Where she felt change was necessary to protect her interests she saw that it was done. For example, she revised Paragraph 6 regarding the payment of alimony to specifically provide that it was not terminable upon her co-habitation, remarriage or death. She also added the language in Paragraph 9 regarding the filing of partnership and individual tax returns. The standard of review is not hindsight but whether a dispute existed as to the terms of the agreement at the time it was entered into.
As to the provisions of Paragraph 9, the language of that paragraph explains the terms "of counsel." It provides, "[t]he wife agrees that she will withdraw as a partner at the Law Offices of Weiss Weiss as of CT Page 27 January 1, 2000, but will remain of counsel without pay excepting the conditions of this paragraph to assist with the conclusion of all pending family law cases at the Law Offices of Weiss Weiss for whatever period necessary but not past December 31, 2000." This language is clear that the "of counsel" role of the Plaintiff was simply a consultive one. This is consistent with the American Bar Association's model rules of professional conduct, Rule 7.5, which refer to one pattern of relationship that may be called "of counsel" which is "the retired partner who remains associated with the firm and is available for occasional consultation."
As to the language of Paragraph 9 regarding fees, there was no evidence presented at trial as to law firms using the terms "gross" and "net" fees when describing the fee they receive or the practice of the Weiss firm regarding any such difference. As a partner in the firm, the Plaintiff should be well aware of how the fees to the firm are calculated and knew this when she drafted this language.
As to the lack of a Schedule A, which was to refer to the personal property that the Plaintiff could remove from the Woodstock property, the Plaintiff added this language to the agreement and presumably knew what she intended to list in Schedule A. The fact that Schedule A was never completed does not invalidate the agreement because there was no evidence presented that the Plaintiff never received all of the property contemplated to be included in Schedule A. Although the Plaintiff made much at trial of her claim that the Defendant has retained certain of her jewelry, the evidence does not support this claim.
As to the fourth claim, Paragraph 16 refers to the parties' having sufficient knowledge of each parties' finances. That language acknowledges that each party has secured and reviewed all the information relating to the financial affairs of the other as they deem necessary. As discussed above, the Plaintiff was well aware of the Defendant's financial situation. The detailed language of the agreement itself regarding the distribution of the assets of the parties, professionally as well as personally, belies any claim that the Plaintiff was unaware of the Defendant's finances. The Plaintiff alleges that the amount of the Defendant's income is unclear and that he has not been forthright in disclosing his true income. The Defendant claims that his gross income is about $200,000 per year, close to the amount the Plaintiff claimed at the pendente lite hearing in December 2000. The Plaintiff claims his annual income is closer to $300,000. However, other than the evidence that the Defendant may engage in sizeable cash transactions, there was no evidence that the Defendant was receiving funds that were not recorded either in his personal or tax statements. Lastly, the Plaintiff herself was responsible for including the language of Paragraph 16 in the agreement. CT Page 28
Therefore the court finds that the agreement is enforceable against the parties.
Although the Defendant moved for summary enforcement of the Marital Dissolution Agreement, he now seeks enforcement of the agreement only if the court determines that it has authority to award attorneys fees to him. General Statutes § 46b-62 provides that "In any proceeding seeking relief under the provisions of this chapter (chapter 815j) . . ., the court may order either spouse or, if such proceeding concerns the custody, care, education, visitation or support of a minor child, either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82 . . ." Chapter 815j of the General Statutes covers proceedings for the dissolution of marriage including those seeking a decree incorporating a previously entered into agreement. Therefore the court has the authority to award attorneys fees to either party to this action. The court's action on such requests will be discussed later in this opinion.
If the court finds that the agreement should be enforced by the court,what should be the scope of the court's review pursuant to GeneralStatutes 46b-66 in determining whether it is air and reasonable?
General Statutes § 46b-66 provides that in determining whether an agreement is fair and equitable and should be incorporated into the court's decree, "the court shall inquire into the financial resources and actual needs of the spouses." The statute specifically does not refer to the criteria to be used in determining orders of alimony or property distribution in a contested matter as set forth in General Statutes § § 46b-81 (c) and 46b-82 including the causes for the breakdown of the marriage. Therefor the court need not look at the various and sordid events that occurred between the parties prior to or after the signing of the agreement in determining whether it is fair and equitable. The court need consider only the financial resources and actual needs of each of the parties.
The Defendant claims that the agreement is more than fair and equitable in a financial sense because pursuant to the agreement the Plaintiff received more than fifty per cent, in fact, closer to sixty per cent, of the parties' assets. The Defendant claims that the Plaintiff received substantial and ample financial resources under the agreement.
As to the second part of the inquiry, the "actual needs" of the parties, the Defendant claims that the court "should consider whether the CT Page 29 spending of the Plaintiffs money or the depletion of her assets were necessary for extraordinary needs or not." The Defendant also claims that the Plaintiff cohabits with another man and has since November 1999 and that he provides for her basic housing. Lastly, the Defendant claims that the Plaintiff has a substantial earning capacity.
Although the Plaintiff argues against enforcement of the agreement by the court, she agrees that numerous terms of the agreement should be adopted by the court. She agrees that the transfers of property set forth in Paragraph 4 should remain and that the Defendant should continue to pay the mortgage on the Nantucket property as provided in Paragraph 6. She acknowledges that the payment to her of $175,000 pursuant to Paragraph 5 is appropriate. She agrees that the accounts have been divided as provided in Paragraph 7, although she alleges that there are additional certificates of deposit in the Defendant's name but the evidence did not bear this out. Pursuant to that paragraph she received $281,700 from two investment accounts. She also agrees that the division of the cars, horses and airplanes provided for in Paragraph 8 has been made except that the Defendant has let her also keep the 1994 Jeep Wagoneer that was to be his under the agreement. She also agrees that the provisions of Paragraph 9 are an appropriate dissolution of the law practice and should be adopted by the court.
As to the review required by General Statutes § 46b-66, the Plaintiff claims the court should consider the unequal incomes of the parties and the unequal abilities of the parties to earn income in the future as well as the lack of appraisals of the assets.
The Woodstock home is valued at $545,000 with a mortgage of $228,000. The property on School Street in Danielson is valued at $210,000. There is no mortgage on this property. The Nantucket property is valued at $550,000 with a mortgage balance at the time of the signing of the agreement of $48,000. The horse Arion is valued at $25,000 for insurance purposes and the horse Coast to Coast is valued at $45,000.
As to the accounts distributed under Paragraph 7 of the agreement, each of the parties received $98,000 from the First Investor account and $183,700 from the New England Securities account and $40,000 from the MBNA account. From the other accounts each received about $100,000. Each retained their own life insurance policies. The Plaintiffs had a cash value of $35,000 and the Defendant's had a cash value of $8,500. Considering the value of the other assets, the cars, planes, and horses, the Plaintiff received $1,110,900 pursuant to the agreement and the Defendant received $1,094,400. In addition, the Plaintiff received, or will receive, $175,000 in cash. This brings her total to $1,285,900. This CT Page 30 is more than fifty percent of the parties' assets not including the parties' law firm. As to that asset, the agreement provides that the Plaintiff will receive one-third of all contingency fees generated from personal injury cases at the Law Offices of Weiss Weiss active as of November 1, 1999 and fifty percent of all fees generated from closed dissolution and custody files at the Law Offices of Weiss Weiss concluded as of November 1, 1999. Based on the contribution of each to this practice, this is a fair division.
As required by General Statutes § 46b-66 the court must look at the parties financial resources and actual needs in determining whether the agreement is fair and equitable. The agreement on its face is a fair one. It divides the property of the parties in a manner that is more than equitable to the Plaintiff. She now has, as shown on her financial affidavit, $738,317 in assets. Although she lists debts of $133,928 all but a few thousand of this amount have been incurred since the parties' separation. The Plaintiff argues that these were incurred as a part of her living expenses and the expense to set up her new office. However, her weekly expenses are $1,245. of those expenses, $436 relate to the care of her horses. This expense need not be considered as an actual need of the Plaintiff as contemplated by the statute since her horses are not necessary to her well being nor are they essential to her livelihood. In any event, the Plaintiff received sufficient assets and income pursuant to the agreement that the incurring of sizable debt was not necessary. If the agreement is approved by the court she also will receive the moneys still owed to her pursuant to Paragraphs 9 and 5. Those amounts are well over $100,000.
As to the Plaintiffs potential future earnings, she has opened an office for the practice of law. Although the Plaintiff argues that the Defendant has a much larger earning capacity than her because personal injury work is more lucrative than family law, the Plaintiff has begun to do personal injury as well as family law cases as part of her new practice. Her own advertisement states that her practice is limited by preference to "serious personal injuries, motor vehicle accidents, divorce and family law." As noted previously, the Plaintiff is fairly young, with a strong legal background and with the ability to learn a new area of law and to be successful in it, as she has been in the area of family law.
Therefore the court finds that the agreement is fair and equitable.
Lastly the Defendant argues that he should be given credit against the moneys he still owes the Plaintiff under the agreement for the payments he made pursuant to the pendente lite orders. The court will not do so. The court had the authority to enter such orders pendente lite pursuant CT Page 31 to statute despite the existence of the agreement since its enforceability would be decided on the merits of this dissolution action and not at the hearing on the request for pendente lite orders. The court was not, and did not, determine the validity of the agreement prior to entering such orders. Fitzgerald v. Fitzgerald, 169 Conn. 147, 150
(1975).
Attorneys' Fees
The Defendant claims that if the court orders enforcement of the agreement, he should be awarded attorneys' fees. As noted above the court has jurisdiction to do so. The Plaintiff also requests an award of attorney's fees.
The Defendant cites Koizim v. Koizim, 181 Conn. 492, 500-501 (1980) and Turgeon v. Turgeon, 190 Conn. 269, 280-281 (1983) for the principles the court must apply in determining a request for fees. In Kozim the Court stated: "Counsel fees are not to be awarded merely because the obligor has demonstrated an ability to pay. "Courts ordinarily award counsel fees in divorce cases so that a party (usually the wife) may not be deprived of her rights because of lack of funds. Krasnow v. Krasnow, 140 Conn. 254,265, 99 A.2d 104 (1953); Steinmann v. Steinmann, 121 Conn. 498, 504,186 A. 501 (1936).' Ridolfi v. Ridolfi, 178 Conn. 377, 380, 423 A.2d 85
(1979). Jn making its determination regarding attorney's fees the court is directed by General Statutes 46b-62 to consider the respective financial abilities of the parties. Murphy v. Murphy, 180 Conn. 376,380, 429 A.2d 897 (1980). Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so." In Turgeon the Court noted that it had subsequently refined Koizim in other cases and stated that "[i]n Fitzgerald v. Fitzgerald, 190 Conn. 26, 459 A.2d 498 (1983), we further refined Koizim by setting forth guidelines to aid the trial court in making its determination. We there stated (p. 34) "if, based on the total financial resources of the parties, the trial court concludes that denying an award of counsel fees would not undermine its purpose in making its prior financial orders, the court should allow each party to pay his or her own counsel fees. If, on the other hand, the trial court concludes, based on the total financial resources of the parties, that denying an award of counsel fees would undermine its prior financial orders, then it may award counsel fees to the requesting party.'" There the Court held an award of attorneys' fees was not appropriate because the liquid assets being made available to the wife were ample and she had business skills such that she could obtain appropriate employment.
The Defendant claims that if the Plaintiff had not breached the CT Page 32 agreement they would have been divorced in the spring of 2000. Instead he was required to expend $100,000 in attorneys fees engaging in lengthy litigation. However the court notes that the Defendant did not respond to the Plaintiffs complaint until September 2000 and not until June 2002 did he seek summary enforcement of the agreement. Therefore the Defendant bears some of the responsibility for the delay in the resolution of this matter. On the other hand, the parties had an agreement, which the court finds fair and equitable, and the Plaintiff has sought to undermine those provisions she no longer likes while taking advantage of those she does which has resulted in this lengthy litigation to the detriment of the Defendant's position under that agreement.
The court also has broad equitable powers in fashioning an appropriate order. As the court stated in Pasquariello v. Pasquariello, 168 Conn. 579,584-585 (1975). "While an action for divorce or dissolution of marriage is a creature of statute, it is essentially equitable in its nature. Stoner v. Stoner, 163 Conn. 345, 356, 307 A.2d 146. As we said in German v. German, supra, 160, 188 A. 429. "In New York State as with us, divorce, with its incident of alimony, is a creature of statute. Ackerman v. Ackerman, 200 N.Y. 72, 76, 93 N.E. 192; Cary v. Cary, . . . (supra, 258, 152 A. 302). It does not, however, follow that an action for divorce is one at law. The Legislature can create equitable rights and provide equitable remedies as well as it can those cognizable in the law courts. Obviously the relief given in a divorce action is not such as could be granted in a common-law court, but is essentially equitable in its nature.' "The fact that equitable and legal rights have come to be administered by a single court does not change the nature of the decree. German v. German, supra, 162, 188 A. 431 . . . The power to act equitably is the keystone to the courts ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. Without this wide discretion and broad equitable power, the courts in some cases might be unable fairly to resolve the parties' dispute, i.e., where the sole asset of the parties is their residence to which both have contributed. Equity certainly does not contemplate such a result. Clark, Domestic Relations § 14.8. Equity jurisdiction once obtained will be retained for the purpose of administering complete relief. Seymour Water Co. v. Horischak, 149 Conn. 435, 442, 181 A.2d 112; Clipfel v. Kantrowitz, 143 Conn. 184, 188, 120 A.2d 416."
Since the actions of the Plaintiff in seeking to abrogate the agreement she drafted has resulted in this lengthy and unpleasant litigation, which in turn has caused the Defendant to incur significant legal fees, the court orders that the Plaintiff pay the Defendant $50,000 in attorney's fees. The Plaintiff has sufficient liquid assets to make such a payment. The Plaintiffs request for attorney's fees is denied. CT Page 33
Conclusion
Thus, after taking into consideration the criteria required by the statutes and the application of those criteria to the facts found by the court, the court enters the following orders:
1. A decree is entered dissolving the marriage of the parties on the grounds of irretrievable breakdown.
2. The court finds pursuant to General Statutes § 46b-66 that the Marital Dissolution Agreement dated November 30, 1999 is fair and equitable and it is incorporated by reference in the judgment.
3. The Plaintiff shall pay the Defendant $50,000 in attorney's fees on or before April 4, 2003.
4. The Defendant shall pay the Plaintiff the sums still owing under Paragraphs 5 and 9 of the agreement on or before April 4, 2003.
5. The Defendant at the time of the payment to the Plaintiff as required by Paragraph 9, shall provide the Plaintiff with an accounting as to how the payment was calculated.
6. Except to the extent the Marital Dissolution Agreement provides otherwise, each party will pay for and hold the other party harmless from the liabilities listed in their respective financial affidavits.
6. The Defendant shall pay the Plaintiff $20,748 which represents one half of the parties' income tax refund for 1999 on or before April 4, 2003.
7. The Plaintiffs attorney shall prepare the judgment file which shall be signed by both parties and their attorneys and submitted to the court on or before February 28, 2003. A signed copy of the Marital Dissolution Agreement dated November 30, 1999 shall be attached to the judgment file.
 ___________________, J. Jane S. Scholl
 Appendix MARITAL DISSOLUTION AGREEMENT
CT Page 34
THIS AGREEMENT is made this 30th Day of November, 1999, by and between CLAUDIA S. WEISS of Woodstock, Connecticut (hereinafter referred to as "Wife") and MARTIN T. WEISS, of Woodstock, Connecticut (hereinafter referred to as "Husband").
The parties married on November 22, 1987 at Woodstock, Connecticut, and have no minor children between them. As a result of differences between them, the parties separated in October, 1999 and since such date have lived separate and apart. The parties have concluded that their differences are such that they should make a legal division of their property and obligations, settle all issues concerning distribution of assets and a dissolution of their marriage.
The Wife will institute a legal action, claiming a dissolution of marriage and other relief in the Superior Court for the Judicial District of Tolland, at Rockville bearing docket number PA-99
In consideration of the mutual promises in this Agreement, and other good and valuable consideration, the parties agree as follows:
1. PURPOSE OF AGREEMENT. This Agreement has been entered into by the parties for the purpose of settling all claims and demands which each may have against the other, including their maintenance, the settlement of property rights, medical insurance, and the determination of other rights and obligations arising from the marital relationship.
2. RELATIONSHIP TO COURT ACTION. This Agreement shall be fully disclosed to the court which hears the issue of the dissolution of marriage of the parties. At the time of any final hearing in the dissolution of marriage action, neither party will request of the court any provision contrary to this Agreement and the parties shall recommend to the court that this Agreement become part of the court file. This Agreement shall not merge with any court decree affecting the parties, but shall survive any such decree and remain in full force and effect. Any modifications of the final decree (Judgment) by a court of competent jurisdiction shall be deemed automatically to modify the terms of this Agreement and neither party thereafter shall seek to interpose or enforce any of the terms of this Agreement which shall differ from the Judgment as modified.
3. PRIVACY. The parties intend to continue to live separate and apart from each other for the rest of their lives. Each party may reside at such place or places as he or she may select. Each party hereafter shall be free from all interference, authority and control by the other party, as if each were unmarried. CT Page 35
4. REAL PROPERTY.
a. The wife shall quit-claim all of her right, title and interest in and to the marital home located at 168 West Quassett Road, in Woodstock, Connecticut to the husband. The husband shall be solely responsible for payment of the mortgage, taxes, insurance, and other expenses associated with said property and hold the wife harmless therefrom. The husband shall have exclusive use possession of said property until a transfer of title is effectuated. The husband agrees to provide reasonable access to the wife for the purpose of retrieving any personal belongings that may be left in storage by the wife after January 1, 2000 and through the pendency of this dissolution action.
b. The wife shall quit-claim all of her right, title and interest in and to the business property located at 133 School Street, in Danielson, Connecticut to the husband. The husband shall be solely responsible for the taxes, insurance, and other expenses associated therewith and hold the wife harmless therefrom. The husband shall have exclusive use 
possession of said property until a transfer of title is effectuated.
c. The husband shall quit-claim all of his right, title and interest in and to the real property located at 26 Arlington Street, Nantucket, Massachusetts. The wife shall be solely responsible for the mortgage, taxes, insurance, and other expenses associated with said property and hold the husband harmless therefrom. The wife shall have exclusive use and possession of said property until a transfer of title is effectuated.
5. PROPERTY SETTLEMENT. In consideration of the wife's agreement to quit-claim her interest in the properties located at 168 West Quassett Road, in Woodstock, Connecticut and 133 School Street, in Danielson, Connecticut, the husband shall pay the wife the sum of $175,000.00. Payment of said sum shall be made as follows: $125,000.00 due on or before January 1, 2000 and $50,000.00 due on or before January 1, 2001.
6. ALIMONY. The husband shall pay the wife the sum of $1,200.00 monthly periodic alimony until the mortgage balance of approximately $48,000.00 on the 26 Arlington Street, Nantucket, Massachusetts property is paid in full. In addition, the husband shall pay monthly stable board up to $650.00 monthly for one horse for a period of one year. Said alimony shall be non-modifiable as to term or amount under any circumstances, including the wife's Co-habitation, re-marriage or the death of either party. CT Page 36
7. BANK ACCOUNTS, RETIREMENT SAVINGS, STOCKS, BONDS, MUTUAL FUNDS, ANNUITIES AND LIFE INSURANCE POLICIES. The parties shall cooperate in dividing all personal bank accounts, retirement savings accounts, stocks, bonds, mutual funds, whether sole or joint, on a fifty/fifty basis. Each party shall retain their respective annuities and life insurance policies as their sole property, without claim by the other.
8. AUTOMOBILES, AIRPLANES, SHOW HORSES. The wife shall retain the 1998 Chevrolet Corvette, 1995 Jeep Wrangler, Hanoverian/T.B.Show Horse known as "ARION", Dutch Warmblood/T.B. Show horse known as "COAST TO COAST" as her sole property. The husband shall retain the 1963 Chevrolet Corvette, 1994 Jeep Wagoneer, 1964 Ford Galaxy, 1966 Cherokee Six Airplane and 1944 Piper Cub Airplane, or any other airplanes hereafter acquired, as his sole property. The husband shall be entitled to exclusive use and possession of the 1998 Chevrolet Corvette until January 1, 2000 at which time title, registration, and exclusive use and possession shall be transferred into the wife's name solely.
9. BUSINESS PARTNERSHIP AND ACCOUNTS RECEIVABLE. The husband and wife are partners at the Law Offices of Weiss Weiss located at 133 School Street, in Danielson, Connecticut. The wife agrees that she will withdraw as a partner at the Law Offices of Weiss Weiss as of January 1, 2000, but will remain of counsel without pay excepting the conditions of this paragraph to assist with the conclusion of all pending family law cases at the Law Offices of Weiss Weiss for whatever period necessary but not past December 31, 2000. The husband shall maintain the wife's bar standing including occupational tax and professional liability insurance through December 31, 2000. The wife agrees to thereafter pay all premiums necessary to maintain tail coverage through December 31, 2002 naming herself and the husband as covered insureds under said policy. The wife shall receive 1/3 of all contingency fees generated from personal injury cases at the Law Offices of Weiss Weiss active as of November 1, 1999 and 50% of all fees generated from closed dissolution and custody files at the Law Offices of Weiss Weiss concluded as of November 1, 1999. The parties have also agreed that the wife shall receive a 20% interest in the fee generated from a recent stipulated settlement in the Second District Workers' Compensation Division entitled "COTE VS. TOMASSO CONSTRUCTION". Other than the aforementioned, the wife therefore, agrees to waive any claim in the business to include, but not be limited to, the cash, accounts receivable, inventory, physical assets, (other than her office furnishings which may be removed at a mutually agreeable future date), and other value related to the business which shall remain the property of the husband. The parties agree to expedite the filing of partnership and individual tax returns upon the conclusion of fiscal year 1999. After CT Page 37 being advised as to their tax liability for 1999, and after payment of any taxes due, from the partnership account, the parties agree, thereafter, to split on a 50/50 basis the business account for the Law Offices of Weiss Weiss.
10. MEDICAL INSURANCE. The husband shall maintain the wife's medical insurance coverage currently in effect as available through the Law Offices of Weiss Weiss. The Wife acknowledges that said medical insurance coverage is available only throughout her period of counsel to the firm. Said "of counsel" status may be modified hereafter from time to time by joint agreement of the parties but no longer than three years from the date of this agreement.
11. DEBTS LIABILITIES. The husband and wife shall pay all outstanding credit card debts, sole or joint, as they appear on statements from their joint personal assets through December 1, 1999. The parties have heretofore agreed that as of said date, the wife will thereafter use the Citibank Advantage Visa card for her own personal use and will be solely responsible for any debt accrued on or after December 1, 1999. The husband has heretofore agreed to use the Citibank Platinum Select Mastercard for his own personal use and will be solely responsible for any debt accrued on or after December 1, 1999.
12. PERSONAL PROPERTY. With the exception of those items specified on Schedule A, attached hereto, which the wife shall be entitled to remove from the 168 West Quassett Road residence, the parties have divided their personal property to their mutual satisfaction.
13. ESTATE OBLIGATION OF PARTIES. If either party is in default hereunder at the time of his or her death, the estate of that party shall be obligated and responsible for such liability as may be incurred by reason of that party's default and such liability shall be a charge upon the estate of that party.
14. RELEASE OF ESTATE RIGHTS. Subject to the provisions of this Agreement and to any will or codicil executed after the date of this Agreement, each party releases, waives and relinquishes any and all rights that he or she now may have or hereafter may acquire as spouse under the present or future laws of any jurisdiction (a) to share in the estate of the other party upon the latter's death and (b) to act as executor or administrator of the other party's estate. This provision is intended to constitute a mutual waiver by the parties to take against each other's last wills under the present or future laws of any jurisdiction. Nothing in this section, however, shall be deemed to relieve either party or his or her estate from, or deprive either party CT Page 38 of the right to enforce, the provisions of this agreement.
15. MODIFICATION OR WAIVER. A modification or waiver of any provision of this Agreement shall be effective only if effected pursuant to the foregoing Section 2 or if made in writing and executed with the same formality as this Agreement. Any modification of this Agreement, whether agreed upon or not, shall be submitted to a court of competent jurisdiction for confirmation or determination, so as to make this Agreement and the court decree consistent. The failure of either party to insist upon strict enforcement of any provision of this Agreement shall not be construed as a waiver of any subsequent default of any similar nature.
16. INFORMED AND VOLUNTARY EXECUTION. Each party has been furnished with all information relating to the financial affairs of the other which has been required; each party has secured and evaluated all information each party has deemed necessary; each parry has sufficient understanding of the financial condition of the other, the provisions of this Agreement and their legal effects, and each party has entered into this Agreement voluntarily and upon mature consideration.
17. INDEPENDENT COVENANTS. Each of the respective rights and obligations of the parties shall be deemed independent and may be enforced independently irrespective of any of the other rights and obligations set forth herein.
18. ACCEPTANCE OF SETTLEMENT. Each party acknowledges that the provisions of this Agreement are fair, adequate and satisfactory, and accepts such provisions in full and final settlement and satisfaction of all claims and demands for financial support and in satisfaction of all property rights and all obligations otherwise arising out of the marital relationship of the parties.
19. ENTIRE AGREEMENT. This Agreement contains the entire understanding of the parties) and no oral statement or prior written matter shall have any force or effect upon this Agreement. The parties confirm that there are no representations, warranties, covenants or under than those expressly set forth herein.
20. BINDING EFFECT. Except as otherwise provided herein, all the covenants, promises, stipulations, agreements and provisions contained herein shall apply to, and be binding upon the heirs, executors, administrators, personal representatives and assigns of the Husband and Wife. CT Page 39
21. GOVERNING LAW. This Agreement shall be construed and governed in accordance with the law of Connecticut.
IN WITNESS WHEREOF, the parties have hereunto set their hands and seals on the day of year first above written.
(Signed: Claudia S. Weiss and Martin T. Weiss; Witnesses: Carrie A. Gervais and Susan Mulvey) CT Page 40